Jenkins, District Judge.
The conceded facts upon which the present application for a receiver and for an injunction are based, so far as now necessary to state them, are these: The complainant on the 2d day of January, 1892, recovered judgment in this court in an action at law against the Oconto Water Company for $24,250.04 damages and costs, and, upon return of execution nulla bona, filed this bill against the judgment debtor and others to subject its property to the payment of the judgment. The Oconto Water Company was incorporated under the Revised Statutes of Wisconsin, on the 8th day of July, 1890, for the purpose of constructing and operating a system of waterworks within the city of Oconto, and of supplying the city and its inhabitants water for protection against fires, and for domestic, manufacturing, and other purposes. On the 9th day of July, 1890, the city of Oconto adopted an ordinance whereby it was ordained “that the Oconto Water Company, its successors and assigns, be and are hereby authorized, subject to the limitations herein or by law provided, to construct, own, maintain, and operate waterworks in the city of Oconto; to lay pipes for the carrying and distributing of water in any of the streets, avenues, alleys, lanes, bridges, or public grounds of the city, as now or may hereafter be laid out; to acquire and hold, as by law authorized, any and all real estate, easement, and water rights necessary to that end and purpose, with all necessary and proper buildings, wells, conduits, or other means of obtaining water supply, with all necessary machinery and attachments thereto, to supply the city and the inhabitants thereof with good and *30 •wholesome water, suitable for fire and domestic purposes; and for this ^purpose may enter upon any street, avenue, alley, lane, stream, bridge, or public ground under control of the city, to take up any pavement or sidewalk thereon, and make such excavations as may-be necessary for the laying of such pipe and attachments.” The ordinance further purports to grant continuance of the rights and privileges for a period of 30 years, and contracts for the use of hydrants and a supply of water for .a like period at a specified annual rental. The city further undertakes, upon request of the water company, to adopt and maintain an ordinance protecting the company “in the safe and unmolested enjoyment of the franchise hereby granted, from waste of water by consumers,” and “to carry into effect the provisions of this ordinance, and the contract thereunder entered into,” and grants to the water company, “its successors ¡and assigns,”—so runs the ordinance,—“the power to make, adopt, and enforce regulations not inconsistent with the law, for the convenience and .security of said grantee, its successors or assigns, as well as that of the public, in the operation of said mains, and may enforce such regulations •by cutting off the supply of water, or otherwise, and shall have the right :at all seasonable hours of the day to have access to the water pipes and .meters of any water takers, to protect themselves against abuse or fraud, .and repair, observe, or remove the same, and may require all water takers to sign a contract to observe all reasonable regulations, as a consideration for furnishing water.” The ordinance undertakes also to regulate the maxium charges to consumers, “collectible quarterly in advance, •except sprinkling rates, which shall be paid in advance for the season,” •and provides that the company shall have the right, at will, to supply ■consumers at the meter rate instead of at the schedule rates, and that connections between the mains and the consumer shall be made at the •expense of the consumer.
The debt of the complainant, for which it recovered its judgment, was for iron pipes furnished, to be used, and which were used, in the construction of the waterworks plant, under a contract therefor dated August 28, 1890. The pipe was delivered during the months of September, October, and November of that year, and laid in the streets of the city. On the 13th day of September the defendants Andrews & Whit-comb entered into an agreement with the water company, by which Andrews & Whitcomb agreed to loan to the company a sum not exceeding •$40,000, upon interest, to be furnished between that date and January 1, 1891. The Oconto Water Company, in consideration of the premises, agreed to make immediate transfer in trust to Andrews & Whit-comb “of the Oconto waterworks franchise as issued to said Oconto Water Company,” together with the entire issue of stock of the company, .amounting to $100,000, and further agreed to issue immediately $100,000 in the first mortgage bonds of the company, to be secured on the entire Oconto waterworks franchise, and all the rights and privileges of said companj'; the deed of trust to be made to some trust company thereafter to be agreed upon by the parties. The stock and bonds were to be delivered to Andrews & Whitcomb as collateral security for the money to *31 be advanced, and upon payment of the loan, with 7 per cent, interest, and the further sum of $5,000, were to be returned to the company. Afterwards, and about October 1,1890, in fulfillment of that agreement, an assignment of what is denominated in the answer “the rights and franchises acquired by said company under and in virtue of said city ordinance No. 153 of said city of Oconto” was executed by the water company, and delivered to Andrews & Whitcomb. This document was antedated to September 13, 1890, and by its terms sells, assigns, transfers, and sets over to Andrews & Whitcomb “all the rights, privileges, immunities, franchises, and powers, of whatsoever name and nature, which were granted unto the said Oconto Water Company in and by that certain ordinance passed by the common council of said city of Oconto, and approved by the mayor of said city on the 9th day of July,* 1890, said ordinance being entitled ‘An ordinance providing for a supply of water to the city of Oconto, Wis., and its inhabitants, and authorizing the Oconto Water Company, its successors and assigns, to construct, •operate, and maintain waterworks therein.’” This contract was as security for the repayment of the loan contemplated by the agreement of September 13,1890. Certificates for the entire issue of the stock of the company were delivered to Andrews & Whitcomb, except as to three shares made out by their direction in the names of others. The entire issue of stock was held by them as collateral security, as provided in the agreement of September 13, 1890.
At a meeting of the directors held October 29, 1890, action was had, authorizing the issue of first mortgage gold bonds of the company, to the amount of $125,000, in sums of $1,000 each, numbered consecutively from 1 to 125, both inclusive, payable in 25 years, with interest coupons attached; 100 of such bonds to be negotiated and sold, to provide funds for the completion of the system; the remaining bonds to be negotiated and sold, to provide funds for the extension of the system as-may thereafter be deemed advisable; such bonds to be secured by trust deed to the Minneapolis Trust Company upon the franchises and rights of the company. The action of this meeting of the board of directors was confirmed at a meeting of the stockholders held subsequently on the same day. The bonds and the trust deed w'ere prepared and executed, and bore date November 1, 1890. The trust deed was recorded in Oconto county, November 13, 1890, in volume 52 of Deeds, p. 394. On the 18th day of November, 1890, the officers of the company delivered to Andrews & Whitcomb 100 of such bonds as security, in accordance with the agreement of September 13, 1890; the other 25 bonds being lodged with the trust company. The sum of $40,000 mentioned in the agreement of September 13, 1890, was actually loaned to the •company by Andrews & Whitcomb on or prior to December 23, 1890, the last sum of $5,000 being advanced on that day, and they received the notes of the company for the total loan pursuant to the terms of the agreement. On March 13, 1891, the company contracted with Andrews •& Whitcomb for a further loan of an amount not to exceed $12,000, to •complete the work; they to hold the security then held by them as col *32 lateral to the loan under the agreement of September 13, 1890, as further security for all additional loans theretofore made by them, amounting to $4,439.79, and for the loan of $12,000 so contracted to be made. This latter sum was advanced to the company on the 13th day of March, and was used in the purchase of material for the plant and for carrying on the,work of construction. It was thereafter ascertained that further funds were essential, and on the 16th day of May, 1891, the parties contracted for another loan by Andrews & Whitcomb, not to exceed $15,000, upon like terms to those of the contract of March 13, 1891; under which agreement Andrews & Whitcomb advanced $8,763.33, which was used in completion of the plant.
On the 17th day of June, 1891, the loans remaining unpaid, Andrews & Whitcomb instituted suit against the Oconto Water Company in the circuit court of Oconto county, and on the 13th day of August, 1891, upon default of appearance to the suit, a decree was rendered that they recover of the Oconto Water Company the sum of $63,887.23, the amount of the loans, with interest, and the costs of the action, which amount was declared to be a lien upon “all the rights, privileges, immunities, franchises, and powers, of whatsoever name or nature, which were granted the said defendant in and by a certain ordinance passed by the common council of the city of Oconto, Wis., and approved by the mayor of said city, July 9, 1890, said ordinance being ordinance No. 153 of said city, and being entitled ‘An ordinance providing for a supply of water to the city of Oconto and its inhabitants, and authorizing the Oconto Water Company, its successors and assigns, to construct, operate, and maintain waterworks therein,’ and upon $100,000 in the capital stock of the defendant, now held in pledge by the plaintiffs, and upon $100,000 in the first mortgage bonds of the said defendant, now also held in pledge by the plaintiffs.” The decree provided for a sale of the property upon which a lien was declared, which was had, Andrews & Whitcomb becoming the purchasers. The sale was confirmed by the court on the 29th September, 1891, and an instrument was executed by the referee, conveying to Andrews (¿Whitcomb the property mentioned, and in the language of the decree, under which they took actual possession of the waterworks system, and have since retained possession, claiming to own the same, upon the ground that by the sale they acquired title to the franchises of the Oconto Water Company, and that the title to all tangible property essential to the use and enjoyment of the franchise passed to them therewith.
At the threshold of the inquiry, the court is confronted with the question as to what rights Andrews & Whitcomb acquired under the agreement of September 13,1890, the instruments executed pursuant thereto, and the foreclosure of the rights thereby acquired. The grant to them was of “all the rights, privileges, immunities, and powers, of whatever name or nature, which were granted unto the said Oconto Water Company” by the ordinance of the city of Oconto. What rights could the city lawfully grant, and what were granted? The solution of the questions depends upon the powers conferred upon that municipality. The *33 city by its charter is vested “with the general powers possessed by municipal corporations at common law,” and with certain governmental powers specifically defined in its charter, and with authority to enact and enforce ordinances under the “general welfare” clause usual in charters of municipal corporations, and specific power is vested touching various matters of municipal concern. Laws Wis. 1882, c. 56. The general power is conferred upon cities to borrow money, and to issue negotiable bonds for the purchase or erection of waterworks. Rev. St. § 942. By chapter 125, Laws 1879, (Sanb. & B. St. § 930a,) the common council of .every city is authorized to permit, subject to such rules and regulations as may be imposed, the laying of pipes in the streets of the city, and their maintenance and use for the purpose of conveying water or steam under the surface of the streets. By the general statute entitled “Of Cities,”—Laws 1889, c. 326, (Sanb. & B. St. c. 40a,)—cities are authorized to own and operate waterworks, and to legislate on all matters with reference to their construction, operation, management, and protection,—section 925m. In the chapter entitled “Organization of Corporations,” (Rev. St. Wis. e. 86,) under which the Oconto Water Company confessedly had being, it is enacted that “any corporation formed for the purpose of constructing and operating waterworks in any city or village of this state may make and enter into any contract with such city or village to supply such city or village with water for fire and other purposes upon such terms and conditions as may be agreed upon, and may, by the consent of, and in the manner agreed upon with, the proper authorities of such city or village, use any street, alley, lane, park, or public grounds for laying water pipes therein; * * * and any such city or village may, by contract duly executed by the proper authorities, acquire the right to use the water supplied by such corporation, or such portion thereof as it may desire, upon such terms and conditions as may be agreed upon by such corporation and the authorities of such city or village.” Section 1780, as amended. These are all the statutory provisions which I have been able to find, touching the question of municipal authority and corporate franchise here presented.
It may be difficult to enumerate the common-law powers of a municipal corporation. It is certain, however, that the conferring of franchises upon other corporations is not one of them. Under its charter, by a well-known principle of law, it can exercise no power not expressly granted, or fairly to be implied. It may be that, by virtue of its duty to care for the public health and safety, a city has the power to contract for a supply of water; but it cannot, without express legislative authority, construct, maintain, or operate waterworks. Dill. Mun. Corp. (4th Ed.) § 27. Without like authority it cannot grant exclusive right to use the streets, and a distributing plant located in the streets is essentially a monopoly. The right to use the public highways for gas pipes or water mains rests in legislative authority directly granted or delegated to municipalities. So, likewise, the right to operate waterworks is of legislative origin, and can only be conferred by a municipal corporation *34 when expressly authorized by the supreme legislative power of the state. It cannot he doubted that the common council of the city of Oconto, in the enactment of the ordinance in question, entertained a broad and generous view of its own powers. It was pleased to confer, or attempt to confer, upon this water company, the power to “ construct, own, maintain, and operate waterworks in the city of Oconto, * * * to acquire and hold, as by law authorized, all real estate, easements, and water rights necessary to that end and purpose, with all necessary and proper'buildings, with conduits or other means of obtaining water supply, with all machinery and attachments thereto,” in addition to the right to use the streets and public grounds of the city for its water inains and pipes, and undertook to regulate contracts and dealings between the water company and the inhabitants of the city, using water, and to bestow upon the company the right of access to the homes of consumers of water, and to regulate its exercise. If the right to confer these great privileges and franchises, and to exercise inquisitorial powers, can be pointed out, the ordinance is effective to the end designed. No ordinance, however, can enlarge, vary, or diminish the powers of a municipality.
Whence came that power? I find no legislative warrant for it. The charter of the city does not confer it. No general law applicable to the city of Oconto grants it. The chapter entitled “ Of Cities” (Sanb. & B. St. c. 40a) was enacted in 1889, (Laws 1889, c. 326.) It provides that no city then incorporated shall be affected by the provisions of the act, unless it shall adopt the same for its government in the manner provided. (Sanb. & B. St. § 925cL) The present charter of the city of Oconto was enacted in 1882. (Laws 1882, c. 56.) There is no suggestion in the record that the city of Oconto has ever adopted the provisions of the general law, and we are not at liberty to assume that it has. Failing such adoption, the city is not affected by, and derives no powers from, that general law, assuming that the chapter has relation to waterworks owned and operated by a corporation other than the municipality, which may be doubtful. The city is therefore only authorized to permit the laying of pipes in the streets, and their maintenance and'use. (Section 930a.) That is not a grant of power to bestow a franchise, but permission to suffer an easement. The law of its incorporation confers upon the Oconto Water Company its franchise (1) to own and operate the waterworks; and (2) to use the streets of the city. •Sanb. & B. St. § 1780. The former power is without condition; the latter is subject to the assent of the municipality. The practical effi■cacy of the franchise may depend upon the discretionary act of the city. The franchise is not, however, derived from that discretion, but from the will of the legislature. The law authorizes the city to assent to the •exercise of a power granted by the statute. The grant of power to the water company—as to the use of the streets—becomes operative only upon the happening of that contingency of municipal assent. That is not a grant of power to a city to confer a franchise. Sims v. Railway Co., 37 Ohio St. 556. The matter is somewhat analogous to the case *35 of an act of the legislature taking effect only upon the assent of the people expressed at the’ polls, which is now generally held to be valid, upon the ground that the law derives its potency from legislative will, and not from the assent of the poll. So, here, the right to use the streets was conferred upon the Oconto Water Company by the law of its incorporation, subject to the contingency of the assent of the city. The franchise emanates from the legislature, not from the municipality. The ordinance is not an exercise of legislative power, but of the right to contract. Indianapolis v. Gaslight Co., 66 Ind. 396.
The case of State v. Madison St. Ry. Co., 72 Wis. 612, 40 N. W. Rep. 487, is not in conflict. The ruling there was to the effect only that, considering the terms of Rev. St. Wis. § 1862, the provisions of the ordinance there under review, by force of the statute, became part of the law of the incorporation of the railway company, and for violation of such provision an action could be maintained by the attorney general to vacate the charter or annul the existence of the railway company, under the provisions of Rev. St. Wis. § 3241. Applying the doctrine of that case to the one in hand, the most that can be said is that the conditions of the assent of the city to the use of its streets inhere in and are part of the law of incorporation of the defendant water company. None the less, however, are its franchises derived from the legislature, and not from the municipality. It is also to be noticed that there is a marked difference in the statute under consideration in that case and those in question here. Section 1862, there considered, provides that “any municipal corporation * * * may grant to any such corporation ”—a street railway corpotion—“ such use, and upon such terms as the proper authorities shall determine, of any streets or bridges. * * * Every such road shall be subject to such reasonable rules and regulations * * * as the proper municipal authorities may by ordinance from time to time determine.” There the legislation does not directly grant to the railway corporation any power to use the streets, but delegates to the municipality the right to grant the power. Here the power is in terms conferred by the legislature upon the water company, subject to the assent of the municipality. There the street railway is subject to constant municipal control. Here the water company is independent of municipal direction except in the use of its streets. It is, I think, clear that the power possessed by the city of Oconto was only to yield its assent to a legislative grant of the use of its streets, and to contract for a supply of water. The franchises of the water company were conferred by the legislature of the state, and not by the ordinance of the city.
The question then recurs, what rights passed to Andrews & Whitcomb under the instruments of transfer and their foreclosure ? By their terms they convey or assign only such rights and privileges as were granted to the water company by the ordinance of the city. No other franchise or rights are attempted to be conveyed. If the right to the use of the streets may be said to have proceeded from the municipality, it was, standing alone, a mere easement. The transfer of such naked right could not carry with it the ownership of the mains, nor the title to the plant as an *36 entirety, nor the franchise to operate the plant, nor to the land upon which the plant was situated. So that if it be true, as is here claimed, that a naked franchise is transmissible; that the franchise is the main and the plant the incident; and that a transfer of the former carries with it the title to the tangible property essential to its use and beneficial enjoyment,—it still remains that here there was no transfer of the franchise to operate the plant, and consequently no transfer of tangible property. It therefore results that the claim of Andrews & Whitcomb to the plant is unfounded inlaw, and its possession by them wrongful as against the complainant.
2. The water company, in fulfillment of its agreement, issued to Andrews & Whitcomb $100,000 of its bonds as collateral to loans made and to be made, to the amount of $40,000. These bonds had not previously been issued. The law of Wisconsin provides (Rev. St. Wis. § 1753) that “no corporation shall issue * * * any bonds * * * except for money * * * actually received by it, equal to seventy-five per cent, of the par value thereof, and all * * * bonds issued contrary to the provisions of this section * * * shall be void.” These bonds were issued in defiance of the statute. That they were pledged, not sold, cannot avail to give them validity in the hands of the pledgee. The term “issue” is here used in the sense of “deliver” or “put forth.” They were delivered and put forth, by the act of pledging, as binding obligations of the company. If the pledge were valid, —if bonds not issued may be used as collateral for a debt less than 75 per cent, of their par value,—the pledgee could, upon default of the company in payment of the loan, lawfully dispose of them for any price obtainable, and they would become, in the hands of a bona fide holder for value, lawful obligations of the company for the full amount expressed, thus defeating the statute, which forbids their issue at less than 75 per cent, of their par value. The statute is its own interpreter. These bonds are void. They are of no binding force for any purpose in the hands of Andrews & Whitcomb. Whether a bona fide purchaser for value from Andrews & Whitcomb could assert the bonds against the company need not be considered. It is the province of a court of equity to prevent such a contingency.
The motion for a receiver and injunction is allowed; the injunction to provide for the deposit of the bonds with the clerk of this court for safe keeping pending this suit, or until further order of the court.